UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
*Filed electronically*

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                              CIVIL ACTION NO. _4:20-CV-66-_JHM

KISHOR N. VORA, M.D.,                                       DEFENDANTS
OWENSBORO MEDICAL PRACTICE, PLLC, and
OWENSBORO HEART AND VASCULAR

## COMPLAINT

1.      The United States of America brings this action to enforce provisions of the False

Claims Act (FCA), 31 U.S.C. § 3729, *et seq*., as well as common law and equity, as a result of

the conduct of Kishor N. Vora, M.D. (Dr. Vora), Owensboro Medical Practice, PLLC, (OMP),

and Owensboro Heart and Vascular (OHV).

2.      As described below, Defendants executed an elaborate and extensive scheme to

maximize profits at the expense of both patients and Medicare. In particular, Defendants

knowingly and willfully accepted illegal kickbacks in exchange for sending Medicare-

reimbursed orders for pharmacogenomics testing (including medically unnecessary and

unreasonable testing) to a particular clinical laboratory: Natural Molecular Testing Corporation

(NMTC).

3.      More specifically, from at least May 1, 2012 through March 31, 2013 (the

relevant time period), in violation of the FCA, Defendants knowingly caused to be submitted,

and conspired to submit and cause the submission of, more than three million dollars in false

claims to Medicare by: (1) entering into financial arrangements with the clinical laboratory

related to the referral of, furnishing of, and submission of claims for pharmacogenomics testing;

(2) receiving illegal remuneration from the clinical laboratory in exchange for referring to the laboratory, in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b; and (3) causing to be billed to Medicare claims for pharmacogenomics testing that were not medically necessary. In so doing, Defendants violated the FCA and were unjustly enriched.

4.      The AKS arose out of concern by Congress that certain types of financial incentives could improperly influence or even corrupt the medical decision-making of physicians and other healthcare providers, resulting in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. As detailed below, that is precisely what has happened here.

5.      Defendants engaged in these schemes knowing that their actions were improper.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action, under 31 U.S.C. §§ 3730, 3732(a) and 28 U.S.C. §§ 1331, 1345, 1367(a).

7.      Venue is proper in this judicial district, under 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to this Complaint occurred in this district.

## THE PARTIES

8.      Plaintiff United States of America, acting through the Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.* (Medicare).

9.      Defendant OMP is a Domestic Limited Liability Company registered in the Commonwealth of Kentucky, with its principal office and registered agent, Dr. Vora, located at

1200 Breckinridge Street, STE 101, Owensboro, KY 42303. *See Exhibit (Exh.) A, OMP Annual Report.*

10.     Defendant OHV is an assumed name of OMP, under Section 365.015 of the Kentucky Revised Statutes. *See Exh. B, Certificate of Assumed Name.*

11.     Defendant Dr. Vora is the sole member, registered agent, and president of OMP and OHV. *See Exhs. A & B, OMP Annual Report and Certificate of Assumed Name.*

12.     Dr. Vora, an individual, is a physician in private practice in Owensboro, Kentucky, with an office located at 1200 Breckinridge Street, STE 101, Owensboro, KY 42303.

13.     Dr. Vora resides at 4204 Hunter Pointe, Owensboro, KY 42303. *See Exh. A, OMP Annual Report.*

## DEFENDANTS' SCHEMES

14.     As detailed below Defendants used a variety of schemes: to receive kickbacks for the referral of claims for pharmacogenomics testing; to routinely order pharmacogenomics testing for most all of Dr. Vora's patients (including Medicare beneficiaries), regardless of individual patient assessment or need; and to routinely order pharmacogenomics testing for most all of Dr. Vora's patients (including Medicare beneficiaries), without utilizing the results in patient treatment.

**I.     Defendants violated the Anti-Kickback Statute.**

**A.     Defendants received improper remuneration from NMTC.**

15.     During the relevant time period, Defendants received at least $335,700.00 in remuneration from the now defunct clinical laboratory NMTC. *See Exh. C, Remuneration Letters.*

3

16.     NMTC remitted this remuneration by monthly checks made payable to "Dr. Kishor Vora" and "Owensboro Heart and Vascular." *See Exh. D, Checks.*

17.     Dr. Vora received a monthly letter explaining the remuneration earned, providing the time period for the remuneration, identifying OHV as the organization, Dr. Vora, as the physician, and a number of patients. *See Exh. C, Remuneration Letters*

**B.     In exchange for remuneration from NMTC, Defendants sent Medicare-reimbursed orders for pharmacogenomics testing to the NMTC clinical laboratory.**

18.     On April 17, 2012, Dr. Vora executed two agreements with NMTC: (1) the NMTC Health Registry Participation Agreement (PRIDE Registry Agreement); and (2) the Natural Molecular Testing Business Agreement with Registry Partners (Business Agreement). *See Exh. E, PRIDE Registry Agreement, & Exh. F, Business Agreement.*

19.     The PRIDE Registry was not included on CMS's list of certified registries. *See* CMS, QUALIFIED REGISTRIES FOR THE 2012 PHYSICIAN QUALITY REPORTING SYSTEM (PQRS) AND ELECTRONIC PRESCRIBING (ERX) INCENTIVE PROGRAM (2012), http://www.cms.gov/ Medicare/Quality-Initiatives-Patient-Assessment-Instruments/PQRS/ downloads/ 2012_Qualified_Registries_Posting_Phase1_03-05-2012.pdf.

20.     The PRIDE Registry Agreement purported to allow Defendants to participate in a data use agreement, created and maintained by NMTC, for the alleged purpose of sharing de-identified Protected Health Information (PHI), as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), with the stated purpose of: (1) defining the contribution of patient demographics in predictive assessments of patients who have, or are at risk, for ailments of the heart; (2) promoting outcomes evaluation; (3) the development of clinical guidelines; (4)

population-based activities relating to improving health or reducing health care costs; and (5) protocol development. *See Exh. E, PRIDE Registry Agreement.*

21.     As signatories to the PRIDE Registry Agreement, Defendants agreed to refer to NMTC pharmacogenomics testing orders for at least 150 patients per month, in order to be eligible to receive compensation. *Id.*

22.     As signatories to the PRIDE Registry Agreement, NMTC agreed to pay Defendants $150 for each referral of pharmacogenomics testing, on a per-patient basis, which took into account the volume of referrals. *Id.*

23.     During the relevant time period, Defendants referred to NMTC 1,206 pharmacogenomics testing orders for Medicare beneficiaries. *See Exh. G, Claims Data.*

24.     During the relevant time period, based on information and belief, Defendants referred to NMTC pharmacogenomics testing orders for 1,032 non-Medicare beneficiaries.

25.     During the relevant time period, Dr. Vora referred to NMTC more Medicare beneficiaries' pharmacogenomics testing orders than any other provider in the United States; the next highest referring provider ordered less than half that amount.

**C.     Defendants acted knowingly and willfully; the number of referrals they made to NMTC for pharmacogenomics testing exponentially increased when they starting being paid for the referrals.**

26.     During the relevant time period, Defendants referred pharmacogenomics testing orders to NMTC, at least in part, because NMTC paid remuneration.

27.     Before Defendants were paid to refer pharmacogenomics testing orders to NMTC, Defendants rarely ordered pharmacogenomics testing.

28.     From March 1, 2011 to January 31, 2012, Defendants transmitted 47 pharmacogenomics testing orders for Medicare beneficiaries to NMTC. *See Exh. G, Claims Data*.

29.     In January of 2012, however, Dr. Vora started communicating with a sales representative working for NMTC, Scott Goodman (Goodman). *See Exh. H, Forensic Examination of iPhone*.

30.     The two discussed the potential for "financial rewards" in ordering pharmacogenomics testing. *Id.*

31.     To reap those financial rewards, Dr. Vora was told to order, "all u clinically can" utilizing the "full panel" of pharmacogenomics tests available at NMTC. *Id.*

32.     The full panel of tests included pharmacogenomics testing of CYP2D6, CYP2C9, CYP2C19, CYP3A4, CYP3A5, and Thrombophilia Risk. *See Exh. I, Pre-Signed Requisition Form*.

33.     Accordingly, Defendants began increasing the number of referrals made to NMTC for pharmacogenomics testing, placing 35 orders for Medicare beneficiaries in February 2012. *See Exh. G, Claims Data*.

34.     Dr. Vora then met with the sales representative and NMTC's Chief Medical Officer, Karthikeshwar Kasirajan, M.D. (Kasirajan), on February 21, 2012; they discussed entering into the PRIDE Registry Agreement.

35.     In order to enter into the PRIDE Registry Agreement, Defendants provided information to NMTC's sales representative. *See Exh. J, Defendant Email 1*.

36.     Specifically, on March 13, 2012, Defendants provided the sales representative with a list of the National Provider Index (NPI) numbers for all providers at OMP and stated they

would "get them rolling" once everything was set up, but they would "need more kits then, too!" *Id.*

37.     Also in March of 2012, NMTC's sales representative agreed to streamline the ordering process by developing custom pharmacogenomics testing order forms for Dr. Vora. *See Exh. K, Goodman Email 1.*

38.     The sales representative further encouraged Defendants to order the "CV Complete Panel[]" of pharmacogenomics tests available at NMTC. *See Exh. L, Goodman Email 2.*

39.     Anticipating payment from NMTC of $150 per-patient referral, in March 2012, Defendants exponentially increased the number of referrals made to NMTC for pharmacogenomics testing.

40.     In March 2012, Defendants placed 537 testing orders for Medicare beneficiaries. *See Exh. G, Claims Data.*

41.     Defendants, however, did not solidify the PRIDE Registry Agreement with NMTC by the end of March 2012.

42.     As Defendants did not receive kickbacks from NMTC for the orders they referred in March 2012, Dr. Vora stopped ordering pharmacogenomics testing from NMTC.

43.     On April 4, 2012, Dr. Vora texted the NMTC sales representative,

> I have not heard any thing [sic] about registry for genetics and we were suppose [sic] to bill for private insurance and nothing has happened[.] I am not sure we can continue like this. Because it takes a lot of time and effort to go and discuss result with patient. I'm going to tell my staff not to send any samples to the company until all this is clarified.

*See Exh. H, Forensic Examination of iPhone.*

44.     The sales representative responded, "Thx for tx Dr. Vora. According to Dr. Kasi the registry should be good to go at the end of the month." *See Exh. H, Forensic Examination of iPhone.*

45.     Dr. Vora answered, "we need to talk before I send any more test [sic]." *Id.*

46.     The two then spoke on the phone, and the sales representative followed up stating, "[t]hx for call today. Kishor I will make sure the Lab follows thru on Al [sic] l commitments." *Id.*

47.     Goodman then emailed Kasirajan, Mark Haley (NMTC's Executive Vice President), Beau Fessenden (NMTC's Chief Executive Officer), and Barry Griffith (NMTC's Vice President of Sales and Marketing) saying, "[j]ust spoke w Vora he is upset and he has instructed his staff not to send nmtc any more tests." *See Exh. M, Goodman Email 3.*

48.     Haley then emailed Kasirajan stating, "[C]an you reach out to Dr. Vora on the timing for pride. He has tested a ton and does not want to continue until he has had an opportunity to discuss with you." *See Exh. N, Haley Email.*

49.     Thereafter, Kasirajan emailed Haley, Goodman, and Ken Wallace (NMTC's Director of Business Development), "just spoke to Dr. Vora . . . I have promised to get him PRIDE contract by next week . . . ." *See Exh. O, Kasirajan Email.*

50.     During this period of uncertainty regarding the kickback arrangement, Defendants drastically decreased the number of referrals made to NMTC for pharmacogenomics testing, placing only 48 orders for Medicare beneficiaries in April 2012. *See Exh. G, Claims Data.*

51.     As the kickback arrangement was in place for May 2012, however, Defendants, once more, exponentially increased the number of referrals made to NMTC for

pharmacogenomics testing, placing 213 orders for Medicare beneficiaries in May 2012. *See Exh. G, Claims Data.*

52.     From June 2012 through March 31, 2013, Defendants referred to NMTC an additional 993 testing orders for Medicare beneficiaries. *See Exh. G, Claims Data.*

**D.     Defendants acted knowingly and willfully; the number of referrals they made to any clinical laboratory for pharmacogenomics testing exponentially decreased when they stopped being paid for the referrals.**

53.     After Dr. Vora learned that NMTC was making changes to their PRIDE Registry Agreement, reducing the per-test remuneration to $105, effective April 1, 2013, Defendants significantly reduced the number of orders they made for pharmacogenomics testing and ultimately stopped ordering pharmacogenomics tests from NMTC. *See Exh. P, NMTC Letter; see also Exh. G, Claims Data.*

54.     In 2014, however, Defendants ordered pharmacogenomics testing from another clinical laboratory, LabCorp; but Defendants only tested three Medicare beneficiaries. *See Exh. Q, 2015-2020 Referrals.*

55.      Thereafter, Dr. Vora's pharmacogenomics testing for Medicare beneficiaries from other labs dwindled; he ordered 32 in 2015, 8 in 2016, 4 in 2017, 5 in 2018, 7 in 2019, and 4 in 2020. *Id.*

**E.     Defendants acted knowingly and willfully; they declined to order pharmacogenomics testing from another clinical laboratory that would not pay for referrals.**

56.     In May 2012, the first month that Defendants were paid for pharmacogenomics testing referrals sent to NMTC, Goodman (NMTC's sales person) left NMTC and began working for another clinical laboratory called PGXL.

57.     At that time, Goodman reached out to Dr. Vora and asked him to order pharmacogenomics testing from PGXL.

58.     PGXL, however, did not have a registry program.

59.     As PGXL did not offer a registry program and NMTC did, Dr. Vora decided not to order pharmacogenomics testing from PGXL and the two have not spoken since the summer of 2012.

**F.     Defendants acted knowingly and willfully; remuneration they received was not fair market value for the services performed.**

60.     Defendants and NMTC both stated that the payments contemplated by the PRIDE Registry Agreement represented "fair market value for physician's work in securing and thereafter providing Patient Health Data to NMTC . . . ." *See Exh. E, PRIDE Registry Agreement.*

61.     To that end, Dr. Vora agreed he would be the one to "enter Patient Health Data electronically into NMTC's computer system." *Id.*

62.     There was not a lot of information to input into the Registry.

63.     Nevertheless, Defendants' support staff secured and provided Patient Health Data to NMTC.

64.     Defendants' support staff also entered Patient Health Data electronically into NMTC's computer system.

65.     Defendants' support staff's per-hour wages are lower that Dr. Vora's billed time.

66.     As the remuneration received by Defendants was based on Dr. Vora's work - not the work of Defendants' support staff - the remuneration was in excess of the fair market value.

II.     **Defendants violated the False Claims Act.**

A.     **Defendants knowingly caused false claims to be submitted.**

67.     Under 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from [an AKS violation] constitutes a false or fraudulent claim for purposes of [the FCA]."

68.     "An AKS violation that results in a federal health care payment is a per se false claim under the FCA." *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016).

69.     "[A]ll claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the [FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

i.     **Every claim tainted by illegal kickbacks were falsely submitted.**

70.     Defendants received kickbacks for each of the 1,206 referrals made to NMTC for pharmacogenomics testing of a Medicare beneficiary, during the relevant time period.

71.     For each of these 1,206 referrals, NMTC submitted a claim for billed laboratory services to Medicare. *See e.g., Exh. R, M.C. Postpay Review and Exh. S, A.D. Postpay Review.*

72.     As these 1,206 claims were tainted by kickbacks, they were falsely submitted.

73.     By ordering these tests to be performed, Defendants caused these 1,206 false claims to be submitted.

ii.     **Most claims were not medically necessary.**

a.     **Defendants did not make individualized assessment of need for the tests.**

74.     Defendants utilized NMTC requisition forms that were pre-signed by Dr. Vora. *See Exh. I, Pre-Signed Requisition Form.*

75.     Defendants directed staff that every patient with a cardiovascular risk factor should receive pharmacogenomics testing.

76.     Defendants defined "cardiovascular risk factors" as including any one of the following: (1) a history of smoking, (2) diabetes, (3) high cholesterol, (4) obesity, or (5) family history of cardiovascular disease.

77.     By utilizing pre-signed requisition forms and directing staff to test all patients who met certain conditions, Dr. Vora delegated ordering tests from NMTC to his subordinates and did not order these tests in reaction to a medical need.

78.     For example, on June 19, 2012, a Medicare beneficiary, J.A.E., went to Defendants for a post-vein procedure ultrasound. *See Exh. T, Medicare Administrative Contractor Complaints.*

79.     While in the office, Defendants asked to swab J.A.E.'s mouth; J.A.E. did not know why J.A.E. was swabbed but agreed to do so and signed a consent form. *Id.*

80.     After J.A.E. received a Medicare Summary Notice with charges to Medicare for the pharmacogenomics test, J.A.E. called Defendants and asked about the test; they told J.A.E. it was a swab sample they took to see how J.A.E. reacted to medications. *Id.*

81.     Defendants also told J.A.E. that the doctor did this with all his patients. *Id.*

82.     Medicare paid $3,181.16 for J.A.E.'s tests ordered by Defendants.

> **b.     Defendants did not utilize the pharmacogenomics test results in patient treatment.**

83.     During the relevant time period, Defendants ordered pharmacogenomics testing from NMTC with reckless disregard or deliberate ignorance of the medical necessity for the tests. *See Exh. U, G.W. Fax; see also Exh. V, S.B. & M.K. Fax.*

84.     It could take months for NMTC to provide Defendants results from the pharmacogenomics test. *See e.g., Exh. W, Patient Results Fax 1, and Exh. X, Patient Results Fax 2.*

85.     As early as January 31, 2012, Defendants knew that patients were not receiving results from the pharmacogenomics tests. *See Exh. Y, Defendant Email 2.*

86.     Despite knowing that the many results would not be returned in time to impact treatment decisions, Defendants continued to order pharmacogenomics tests from NMTC.

87.     Further, Defendants failed to document the medical need for pharmacogenomics testing in the Medicare beneficiaries' medical records.

88.     For example, on July 10, 2012, Defendants collected DNA from Medicare beneficiary M.C. and ordered pharmacogenomics testing from NMTC. *See Exh. R, M.C. Postpay Review.*

89.     M.C.'s medical record fails to mention pharmacogenomics testing. *Id.*

90.     M.C.'s medical record fails to describe a medical need for pharmacogenomics testing. *Id.*

91.     M.C.'s medical record fails to demonstrate how the results of the pharmacogenomics test would impact M.C.'s plan of care. *Id.*

92.     M.C.'s medical record fails to establish that the pharmacogenomics test results were conveyed to M.C. *Id.*

93.     Despite no indication contained in M.C.'s medical records that pharmacogenomics was needed or that the results were used in the care and treatment of M.C., because of Defendants' actions, Medicare paid $3,534.20 for unnecessary tests ordered by Defendants.

94.     As a second example, on February 26, 2013, Defendants collected DNA from Medicare beneficiary A.D. and ordered pharmacogenomics testing. *See Exh. S, A.D. Postpay Review.*

95.     A.D.'s medical record fails to mention pharmacogenomics testing. *Id.*

96.     A.D.'s medical record fails to describe a medical need for pharmacogenomics testing. *Id.*

97.     A.D.'s medical record fails to demonstrate how the results of the pharmacogenomics test would impact A.D.'s plan of care.

98.     A.D.'s medical record fails to establish that the pharmacogenomics test results were conveyed to A.D. *Id.*

99.     Despite no indication contained in A.D.'s medical records that pharmacogenomics was needed or that the results were used in the care and treatment of A.D., because of Defendants' actions, Medicare paid $754.49 for unnecessary tests ordered by Defendants.

100.    Defendants regularly failed to discuss the pharmacogenomics test results with Medicare beneficiaries.

101.    For example, in March 2012, Defendants collected DNA from Medicare beneficiary M.H. and ordered pharmacogenomics testing, but on November 14, 2013, M.H. explained that M.H. did not know about the tests and never heard about the results, even though M.H. had been to the office several times since the test was conducted.

102.    Medicare paid $5,277.56 for M.H.'s pharmacogenomics testing ordered by Defendants.

103.     Similarly, in May 2012, Defendants collected DNA from Medicare beneficiary S.E. and ordered pharmacogenomics testing, but on November 14, 2013, S.E. explained that S.E. did not know about the tests and never heard about the results, even though S.E. had been to the office several times since the test was conducted.

104.     Medicare paid $3,534.20 for S.E.'s pharmacogenomics testing ordered by Defendants.

105.     Likewise, in October 2012, Defendants collected DNA from Medicare beneficiary J.E. and ordered pharmacogenomics testing, but on November 14, 2013, J.E. explained that, although J.E. had been to the office several times, J.E. never received the results.

106.     Medicare paid $3,181.16 for J.E.'s pharmacogenomics testing ordered by Defendants.

107.     In March 2013, Defendants collected DNA from Medicare beneficiary B.G. and ordered pharmacogenomics testing, but on November 14, 2013, B.G. did not know the results from the test.

108.     Medicare paid $754.49 for B.G.'s pharmacogenomics testing ordered by Defendants.

109.     On June 6, 2013, pharmacogenomics test results determined A.P. is a poor metabolizer for warfarin. *See Exh. Z, A.P. Medical Record.* However, A.P.'s results were not included in A.P.'s chart; thus, when A.P. had contact with the office, on July 5, 2013 and again on August 16, 2013, no one changed A.P.'s warfarin treatment. *Id.*

110.     Despite no indication contained in A.P.'s medical records that pharmacogenomics was needed or that the results were used in the care and treatment of A.P., because of Defendants' actions, Medicare paid $1,210.96 for unnecessary tests ordered by Defendants.

**c.    Defendants ordered pharmacogenomics testing which predicted warfarin responsiveness for patients who had received more than five days of warfarin, and the testing was not done in the context of a registered clinical study.**

111.    For example, at the time that Defendants ordered pharmacogenomics testing to predict warfarin responsiveness for A.P, she had received more than five days of warfarin in the anticoagulation regimen. *Id.*

112.    The testing Defendants ordered was not done in the context of a prospective, randomized, controlled clinical study. *See* www.ClinicalTrials.gov.

**B.    Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims to Medicare.**

**i.    Defendants made false certifications on Medicare provider enrollment forms.**

113.    At all times relevant herein, Dr. Vora was and is a Medicare provider. *See Exh. AA, Medicare Provider Agreements.*

114.    Since 2001, OMP has been a Medicare supplier. *Id.*

115.    Under 42 C.F.R. § 424.516(a)(1), Medicare providers and suppliers must certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.

116.    On March 15, 2001, Dr. Vora signed OMP's Medicare Enrollment Application as OMP's authorized official. *Id.*

117.    As OMP's authorized official, Dr. Vora legally and financially bound OMP to the laws, regulations, and program instructions of the Medicare program. *Id.*

118.    In so doing, Dr. Vora certified that he understood "that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-

kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program." *Id.*

119.    Dr. Vora certified he read and understood "the Penalties for Falsifying Information" including deliberately omitting, misrepresenting, or falsifying any information "contained in any communication supplying information to Medicare." *Id.*

120.    Dr. Vora stated he would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare or other federal health care programs, and [he would] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.*

121.    As explained in Section II(A) above, this statement is false, because Defendants knowingly caused false claims to be submitted to Medicare.

122.    Dr. Vora stated he would "abide by the Medicare or other federal health care program laws, regulations, and program instructions that apply" to OMP. *Id.*

123.    As explained more fully below, this statement is false, because Defendants did not abide by the Medicare laws, regulations, and program instructions that apply to OMP.

124.    42 U.S.C. § 1395y(a)(1)(A), applies to OMP and provides that "no payment may be made under part A or part B for any expenses incurred for items of services—which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

125.    As explained in Section II(A)(ii) above, Defendants did not abide by this Medicare law, because Dr. Vora ordered services which were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and Medicare paid for those services.

17

126.    42 C.F.R. § 410.32(a) applies to OMP and provides that a diagnostic laboratory test "must be ordered by the physician who is treating the beneficiary . . . and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

127.    As explained in Section II(A)(ii)(a) above, Defendants did not abide by this Medicare regulation, because the pharmacogenomics tests were not ordered by the physician treating the beneficiary.

128.    As explained in Section II(A)(ii)(b) above, Defendants did not abide by 42 C.F.R. § 410.32(a), because Dr. Vora did not use the results in the management of the beneficiary's specific medical problem.

129.    42 U.S.C. § 1395l(e) applies to OMP and provides that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."

130.    Similarly, 42 C.F.R. § 410.32(d)(2) applies to OMP and provides that "the physician . . . who orders the [diagnostic laboratory test] must maintain documentation of medical necessity in the beneficiary's medical record." *Id.*

131.    Likewise, 42 C.F.R. § 424.5(a)(6) applies to OMP and provides that the provider "must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment."

132.    Finally, Program Instructions included in Medicare Benefit Policy Manual, Chapter 15, Section 80.6.1 apply to OMP and require providers to "clearly document, in the medical record, his [] intent that the test be performed."

133.    As explained in Section II(A)(ii)(b) above, Defendants did not abide by this Medicare law, these two regulations, or program instructions, because Defendants failed to maintain documentation of medical necessity in the beneficiaries' medical records.

134.    Program Instructions included in Medicare Benefit Policy Manual, Chapter 32, Section 250 apply to OMP and explain that, with respect to pharmacogenomics testing to predict warfarin responsiveness, Medicare only covers tests:

> when provided to Medicare beneficiaries who are candidates for anticoagulation therapy with warfarin; i.e., have not been previously tested for CYP2C9 or VKORC1 alleles; and have received fewer than five days of warfarin in the anticoagulation regimen for which the testing is ordered; and only then in the context of a prospective, randomized, controlled clinical study when the study meets certain criteria as outlined in Pub 100-03, section 90.1, of the NCD Manual.

*Id.*

135.    NCD § 90.1(A)(j), further states that controlled clinical studies must be "registered on the www.ClinicalTrials.gov website by the principal sponsor/investigator prior to the enrollment of the first study subject."

136.    As explained in Section II(A)(ii)(c) above, Defendants did not abide by these program instructions, because Defendants ordered pharmacogenomics testing to predict warfarin responsiveness for Medicare beneficiaries who had received more than five days of warfarin in the anticoagulation regimen for which the testing was ordered, and the testing was not done in the context of a prospective, randomized, controlled clinical study registered on the www.ClinicalTrials.gov website.

137.     Dr. Vora certified he would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare." *See Exh. AA, Medicare Provider Agreements.*

138.     Dr. Vora also certified that he would "not submit, or cause to be submitted, claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.*

139.     As explained in Section II(A), these statements in paragraphs 137-138 are false, because Defendants knowingly caused NMTC to submit false and misleading representations on claim forms submitted to Medicare.

> ### ii.     Defendants caused false and misleading representations on claim forms submitted to Medicare by NMTC.

140.     Each claim submitted by NMTC for Dr. Vora's orders of pharmacogenomics tests included a statement whereby NMTC certified that the services rendered were "medically indicated and necessary for the health of the patient." *See e.g., Exh. R, M.C. Postpay Review and Exh. S, A.D. Postpay Review.*

141.     As explained in Section II(A)(ii) above, this statement is false, because the services were not medically indicated and necessary for the health of the patient.

142.     Each claim submitted by NMTC for Dr. Vora's orders of pharmacogenomics tests included a statement whereby NMTC certified that the information on the claim form was "true, accurate and complete." *See e.g., Exh. R, M.C. Postpay Review and Exh. S, A.D. Postpay Review.*

143.     As explained in Section II(A)(ii) above, this statement is false, because the claims were tainted by kickbacks.

## FIRST CAUSE OF ACTION (OR COUNT I)
### FCA: Causing False Claims To Be Presented for Payment
### (31 U.S.C. § 3729(a)(1)(A))

144.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

1445.   Defendants knowingly caused to be presented false or fraudulent claims to Medicare for payment or approval, in violation of 31 U.S.C. § 3729 (a)(1)(A).

146.  During the relevant time period, Defendants, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, caused to be presented false or fraudulent claims that were tainted by kickbacks, in violation of the AKS (42 U.S.C. 1320a-7b(g)).

147.    During the relevant time period, Defendants, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, caused to be presented false or fraudulent claims that were not medically necessary.

148.    Because of the above-described-conduct, the United States sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## SECOND CAUSE OF ACTION (OR COUNT II)
### FCA: False Statements Material to False Claims
### (31 U.S.C. § 3729(a)(1)(B))

149.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

150.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

151.    During the relevant time period, Defendants, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, made, used or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

152.    These false records and statements included false certifications on Medicare provider enrollment forms and false and misleading representations on claim forms that claims for pharmacogenomics testing submitted to Medicare by NMTC complied with the Anti-Kickback Statute, when in fact, those claims violated the Anti-Kickback Statute.

153.    These false records and statements included false certifications on Medicare provider enrollment forms and false and misleading representations on claim forms that claims for pharmacogenomics testing submitted to Medicare by NMTC were medically necessary, when in fact, those claims were not medically necessary.

154.    Because of the above-described-conduct, the United States sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## THIRD CAUSE OF ACTION (OR COUNT III)
### FCA: Conspiracy - False Claims To Be Presented for Payment
### (31 U.S.C. § 3729(a)(1)(C))

155.　The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth here.

156.　Defendants conspired to commit a violation of 31 U.S.C. §§ 3729(a)(1)(A)&(B), in violation of 31 U.S.C. § 3729(a)(1)(C).

157.　During the relevant time period, Defendants and their co-conspirator NMTC knowingly entered into one or more conspiracy to present or cause to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement of pharmacogenomics tests that violated the AKS and FCA, and that were ordered for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

158.　During the relevant time period, Defendants and their co-conspirator NMTC performed acts in furtherance of these conspiracies, by, among other things, entering into the PRIDE Registry Agreement, and submitting, or causing the submission to the United States, claims for pharmacogenomics testing referred to NMTC by providers that violated the AKS and FCA, and that were ordered for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

159.　During the relevant time period, Defendants and their co-conspirator NMTC submitted, made or used, or caused to be submitted, made, or used, such false claims, records, or statements, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

160.     Because of the above-described-conduct, the United States sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## FOURTH CAUSE OF ACTION (OR COUNT IV)
### Unjust Enrichment

161.     The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth here.

162.     Through the acts set forth above, Defendants received payments from kickbacks to which they were not entitled and therefore have been unjustly enriched at the expense of the United States. The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

A.     On Counts I, II, and III, under the FCA, for the amount of the United States' damages, in an amount to be determined at trial, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

B.     On Count IV for unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched, or retained illegally, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

RUSSELL M. COLEMAN
United States Attorney

JESSICA R. C. MALLOY
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
Phone No. (502) 779-2765
Fax No. (502) 625-7110

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

KISHOR N. VORA, M.D., OWENSBORO MEDICAL PRACTICE, PLLC, OWENSBORO HEART AND VASCULAR

County of Residence of First Listed Defendant    DAVIESS
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Michael C. Merrick, Kaplan, Johnson, Abate & Bird, Attorneys at Law, 101 South Fifth Street, #2500, Louisville, KY 40202

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 195 Contract Product Liability | Injury | ☐ 380 Other Personal Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729

Brief description of cause:
The United States of America brings this action to enforce provisions of the False Claims Act (FCA)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** TO BE DETERMINED

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE    4/29/20

SIGNATURE OF ATTORNEY OF RECORD

Jessica R. C. Malloy

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____